UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                              Plaintiff,                    REPORT & RECOMMENDATION

                                                           13-CR-6109G

              v.

RONALD TUTTLE,

                              Defendant.

_____

## PRELIMINARY STATEMENT

By Order of Hon. Frank P. Geraci, United States District Judge, dated July 30,

2013, all pretrial matters in the above-captioned case have been referred to this Court pursuant to

28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 11).

Defendant Ronald Tuttle ("Tuttle") has been charged in a four-count indictment.

(Docket # 10).  Count One charges Tuttle with conspiracy to possess with intent to distribute, and

to distribute, 3,4-methylenedioxypyrovalerone ("MDPV"), a Schedule I controlled substance, in

violation of 21 U.S.C. § 846.  (*Id.*).  Count Two charges him with conspiracy to import MDPV

from China into the United States, in violation of 21 U.S.C. § 963.  (*Id.*).  The conspiracies

charged in Counts One and Two are alleged to span the period November 2011 through on or

about February 7, 2013.  (*Id.*).

Counts Three and Four charge Tuttle with importation of MDPV, in violation of

21 U.S.C. §§ 952(a), 960(a)(1) and 960(b)(3) and 18 U.S.C. § 2, and attempted possession of

MDPV, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2, respectively.  (*Id.*).  Both charges

arise from events that allegedly occurred on February 7, 2013.  (*Id.*).

Currently pending before this Court for report and recommendation are Tuttle's

motions to suppress statements and physical evidence.[1]  (Docket ## 17, 26).  This Court

conducted an evidentiary hearing on the motions on December 20, 2013.  (Docket # 22).  The

government called Francis Zabawa ("Zabawa"), an agent employed by the Department of

Homeland Security.  Tuttle and his fiancee Chrystal O'Dell ("O'Dell") testified for the defense.

(*Id.*).


## FACTUAL BACKGROUND

### I.   Testimony of Zabawa

Zabawa testified that he has been employed as a Special Agent with the United

States Department of Homeland Security for approximately six years.  (Tr. 5).[2]  On February 7,

2013, Zabawa was part of a team of law enforcement officers involved in a controlled delivery of

a package containing sham MDPV addressed to Tuttle at 519 West Water Street, Apartment D,

Elmira, New York,[3] and in the subsequent execution of a search warrant for that residence.  (Tr.

5-7, 34).

---

[1]  Tuttle's motion also sought, *inter alia*, *Jencks* material, Rules 404(b), 608 and 609 evidence, preservation of rough notes, and leave to file additional motions.  (Docket # 17).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on December 20, 2013.  (Docket # 21).

[2]  The transcript of the evidentiary hearing shall be referred to as "Tr."  (Docket # 22).

[3]  The package had been previously intercepted by authorities, searched and the real MDPV replaced with sham MDPV.  (Tr. 6, 32).

On the morning of February 7, a law enforcement officer disguised as an employee of Federal Express attempted to deliver the parcel to that residence. (Tr. 32-33). Tuttle came to the door, and signed for and accepted the parcel. (Tr. 33). Shortly after he took the package inside the apartment, the search team entered the residence at approximately 10:35 a.m. to execute the search warrant. (Tr. 8, 33).

Zabawa, who was not part of the initial entry team, entered the apartment at approximately 10:40 a.m. after it was secured and encountered Tuttle in the living room, where he was lying on the floor in handcuffs. (Tr. 6-8, 34-35). At that time, approximately twelve law enforcement officers were inside the residence, all of whom were dressed in ballistics vests and carrying visible firearms. (Tr. 8-9). Tuttle's girlfriend and a small child were also present in the apartment. (Tr. 6-8). Zabawa told Tuttle that "we're here because of a package you accepted." (Tr. 9). Tuttle replied that his back and legs were hurting. (*Id.*).

Zabawa and Special Agent John Kosich moved Tuttle to a sitting position on a sofa in the living room. (*Id.*). At that point, Zabawa told Tuttle that they had some questions they would like him to answer "if he'd be willing to." (Tr. 9, 13). Zabawa told him that if he was willing to waive his rights and answer the questions, they could go into the kitchen for greater comfort. (Tr. 36). Zabawa then led Tuttle into the kitchen, seated him in a chair at the kitchen table and removed his handcuffs. (Tr. 9). Zabawa and Kosich also sat at the table with Tuttle and introduced themselves. (Tr. 11, 13). Meanwhile, the officers assigned to execute the warrant continued the search of the apartment. (Tr. 10).

After they were seated at the table, Zabawa told Tuttle that they had some questions they would like him to answer, but that "in order to do that [they] would need him to

3

acknowledge that he would waive his rights and agree to answer our questions." (Tr. 11). Tuttle

did not respond. (*Id.*). According to Zabawa,

> so I told him that . . . the reason we were there was because the
> package he accepted – and I made a mention to him that we're
> going to . . . if he didn't want to answer questions, it was perfectly
> fine, it was no big deal, he didn't have to. But that we were going
> to continue with the search warrant and if we came across any
> illegal narcotics in the premises, that . . . [we] advised him that we
> possibly could have to call Child Protective Services because of the
> small baby that was in the residence.

(*Id.*). Zabawa testified that he never indicated to Tuttle that the decision whether to call Child

Protective Services was in any way conditioned on Tuttle's decision whether to cooperate; to the

contrary, Zabawa clarified on cross-examination that he made clear to Tuttle that Tuttle had the

right to choose not to cooperate and that "[r]egardless, we're going to continue our search and . . .

[i]f we happen to find anything, then the possibility we might have to call Child Protective

Services just because of the welfare of the child." (Tr. 62-64). According to Zabawa, he

mentioned Child Protective Services only once to Tuttle. (Tr. 61).

Zabawa continued his interaction with Tuttle by advising that the agents knew

"what was going on . . . [;] we had documents showing him sending quite a bit of money

transfers over to China." (Tr. 12). Zabawa then explained the benefits of cooperation. (*Id.*).

Specifically, he told Tuttle that the United States Attorney's Office ("USAO") "like[s] to see

people that cooperate" and although the agents could not promise "any special deals or anything

like that," they would inform the USAO that he was willing to cooperate and the USAO "would

probably look . . . favorably if he did that." (Tr. 12, 42). The agents again inquired whether

4

Tuttle would be willing to answer questions.  (Tr. 13).  At that point, Tuttle responded that he was willing to answer questions.  (*Id.*).

Zabawa replied that Tuttle needed to read through a statement of rights and acknowledge that he understood that he was waiving those rights.  (*Id.*).  Zabawa handed Tuttle a written statement of rights and waiver form, which recited the *Miranda* warnings.  (G. Ex. 1).  Zabawa read each right aloud and asked Tuttle whether he understood.  (Tr. 15-16).  Tuttle responded that he understood.  (Tr. 16).  At Zabawa's direction, Tuttle then read the form and placed his initials at the end of each statement to indicate that he understood the right.  (Tr. 16; G. Ex. 1).

When Tuttle had completed reading the statement of rights, Zabawa asked him if he understood that he was agreeing to waive his rights and agreeing to speak with the agents.  (Tr. 17, 39-40).  Zabawa also informed Tuttle that he did not have to sign the form.  (Tr. 41).  Tuttle said, "Yes, I understand, I will answer your questions."  (*Id.*).  Zabawa advised him that he needed to sign the form and print his name and reminded him that he could stop the questioning at any time.  (Tr. 17).  Tuttle printed and signed his name under the waiver portion of the form, which provided:

> I have had the above statement of my rights read and explained to me and I fully understand these rights.  I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity.  I was taken into custody at _____ (time), on _____ (date), and have signed this document at _____ (time), on _____ (date).

(G. Ex. 1).  The two agents then dated the form, indicating that Tuttle was taken into custody and waived his rights at 10:48 a.m. on February 7, 2013, and signed the witness lines.  (Tr. 17; G. Ex. 1).

For the next sixty to seventy-five minutes, the agents interviewed Tuttle in the kitchen.  (Tr. 18, 46).  Tuttle agreed to assist the investigation by sending a text message to the person for whom he ordered the package.  (Tr. 19, 41).  The agents accompanied Tuttle into the living room where he logged onto his computer, "got into everything and then showed us . . . what he had in there."  (*Id.*).  They remained with Tuttle in the living room for approximately another hour.  (Tr. 21, 47).  At some point during the interview, the agents permitted Tuttle to have a cigarette.  (Tr. 21).

Also during the interview following the execution of the waiver form, the agents advised Tuttle that the decision whether or not to arrest him would be made by the USAO.  (Tr. 21-22, 43).  At the end of the interview, Zabawa told Tuttle that he would contact the USAO to ascertain the Office's decision.  (*Id.*).  Zabawa apparently contacted the USAO, after which Zabawa informed Tuttle that he was "technically" being arrested, but that he would be released on a "five-day waiver" if he agreed to it.  (Tr. 21, 23, 49).  Zabawa also advised him that the charge he could face was narcotics conspiracy under 21 U.S.C. § 846.  (Tr. 49-50).  Zabawa presented him with a Department of Homeland Security form, entitled "Waiver of Rights under Rule 5(a) of the Federal Rules of Criminal Procedure" (Tr. 23, G. Ex. 2), and explained that if Tuttle agreed to the waiver, he would be waiving until a later date an initial appearance before a magistrate judge.  (Tr. 47-48).  Zabawa read the form aloud to Tuttle, which Tuttle affirmed he understood (Tr. 23) and signed at 1:28 p.m.  (G. Ex. 2).  The form provided in relevant part:

6

Rule 5(a) "Initial Appearance Before the Magistrate Judge of the Federal Rules of Criminal Procedure" provides in pertinent parts as follows:

> A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise.
>
> I, Ronald Tuttle, hereby acknowledge that I have read and understand Rule 5(a) set forth above.  I also acknowledge and understand that, under the terms of Rule 5(a), I have the right to be taken, without unnecessary delay, before the nearest available federal magistrate judge or appropriate local or state judicial officer.
>
> With full and complete understanding of the rights afforded to me by Rule 5(a) of the Federal Rules of Criminal Procedure, I hereby voluntarily waive my right to be taken, without unnecessary delay, to the nearest available magistrate judge or local or state judicial officer.
>
> I am knowingly and intelligently waiving my rights under Rule 5(a) of the Federal Rules of Criminal Procedure for the purpose of assisting Special Agents of the U.S. Immigration and Customs Enforcement.  When these efforts have been completed, I understand that I will be taken to the United States District Court in Rochester, NY for my initial appearance.

(*Id.*).  Zabawa told Tuttle that he would be contacted at a later date with directions to report to court for the initial appearance.  (Tr. 48, 51).

Before the agents departed, Zabawa and Tuttle exchanged cell phone numbers. (Tr. 24).  Zabawa told Tuttle to call him if Tuttle had any questions, and indicated that he would contact Tuttle if he had additional questions.  (*Id.*).  Tuttle was released from custody when the agents left his apartment.

7

Zabawa testified that at no time during his February 7 encounter with Tuttle did Tuttle indicate that he did not want to speak with the agents or that he wanted to consult with an attorney.  (Tr. 19).  Tuttle did not appear to be under the influence of drugs or alcohol and made no complaints of illness or pain following the initial complaints of discomfort when he was handcuffed on the floor.  (Tr. 20).

Twelve days later, on February 19, 2013, Zabawa had a follow-up meeting with Tuttle at a parking lot near the Painted Post exit of Interstate 390.  (Tr. 24-25).  Zabawa had arranged the meeting several days earlier during a telephone call with Tuttle.  (*Id.*).  During the call, Zabawa asked Tuttle if he would agree to allow the agents to assume Tuttle's online identity in order to advance the investigation.  (*Id.*).  Zabawa told Tuttle that he was free to choose not to cooperate, but that if he did cooperate, his continuing cooperation would be made known to the USAO.  (Tr. 52-53).  According to Zabawa, Tuttle agreed and stated, "anything he could do to cooperate."  (Tr. 24-25).

At the meeting, Tuttle was accompanied by his girlfriend, his child and his mother, and Zabawa was accompanied by Agent Kosich.  (Tr. 25).  Zabawa asked Tuttle if he was still agreeable to cooperating and allowing the agents to assume his online identity.  (Tr. 26).  He answered that he was.  (*Id.*).  Zabawa presented a consent form permitting the agents "to take over control of and use [his] online presence."  (Tr. 28; G. Ex. 3).  Zabawa read the consent authorization form to Tuttle, obtained Tuttle's account name and passwords and handwrote them on the form.  (*Id.*).  Zabawa asked Tuttle whether he understood "what the form is saying," and Tuttle responded, "yes."  (Tr. 56).  The paragraph above the signature line provided:

> I give this consent freely and voluntarily, without fear, threats, coercion, or promises of any kind.  I have been advised of my right to refuse to allow the assumption of my online presence, and I her[e]by voluntarily waive this right.

(G. Ex. 3).  After again confirming that Tuttle understood that the consent authorized the agents to "go through [his] emails and to send an email and assume [his] online presence," Zabawa asked Tuttle to acknowledge his consent by signing and dating the form, which Tuttle did.  (Tr. 28, 56-57; G. Ex. 3).  The agents thanked Tuttle, shook his hand, told him they would contact him if they had any more questions and left.  (Tr. 28).  The meeting lasted approximately twenty minutes.  (*Id.*).

Zabawa testified that Tuttle never indicated at or prior to the meeting that he did not want to cooperate or wanted to consult an attorney.  (Tr. 29, 60-61).  According to Zabawa, the agents made no promises or threats to Tuttle to induce him to sign the consent form.  (*Id.*).  As with their encounter on February 7, Tuttle appeared coherent and sober.  (Tr. 30).


## II.    **Testimony of Chrystal O'Dell**

Chrystal O'Dell, Tuttle's fiancee, was called by the defense to offer testimony about the February 19 meeting.  She and Tuttle have two children, one of whom was with them on February 19.  (Tr. 66-67).  O'Dell testified that she accompanied Tuttle, along with their child and Tuttle's mother, to a prearranged meeting with Zabawa and another agent in a parking lot in Painted Post.  (Tr. 67).  According to O'Dell, when the agents arrived, they asked Tuttle for his password and screen name, and the agent named John [Kosich] informed Tuttle that "if he did not give the e-mail and password information, he would be arrested that day."  (Tr. 67-68,

9

70-71).   The agents then presented a document to Tuttle, which they did not read aloud, and told

him to fill it out and sign it.  (Tr. 69, 72).  O'Dell testified that Tuttle handwrote the email

address and passwords on the form.  (Tr. 73).

### III.   <u>Testimony of Ronald Tuttle</u>

Tuttle testified that Zabawa called him and stated that he wanted to take over

Tuttle's email and if Tuttle did not agree, he would "come down there and arrest [Tuttle]."  (Tr.

79, 85).  On cross-examination, Tuttle testified that he told Zabawa that he would not provide the

email and account information the agents wanted, and Zabawa responded by threatening to arrest

him if he did not.  (Tr. 90-91).

On February 19, Tuttle, accompanied by O'Dell, their child and Tuttle's mother,

met Zabawa and another agent in a shopping plaza in Painted Post.  (Tr. 80).  According to

Tuttle, the following exchange occurred between Zabawa and himself when the agents arrived:

> [Zabawa] said, 'Are you ready to turn over your e-mail to me?'
> And I said, 'You know, what if I really don't want to turn over the
> e-mail to you?'  And he said to me, 'Well, I could – I could put you
> in the car right now and arrest you.'  And I said, 'Okay,' I said,
> 'What do you want me to do?'  And he says, 'I want you to fill out
> this form basically' – from what I remember of this whole thing, he
> handed me the form or else his buddy handed me the form, I don't
> know which one.  He said, 'You just got to sign this form right
> here.'  That's what he said.  I signed this form on the hood of my
> car.

(Tr. 80-81).  Tuttle testified that he did not read the form, nor did either agent read it to him.  (Tr.

81, 87-88).  He further testified that he gave Zabawa his account name and password information

because Zabawa told him he was "going to jail" unless he did so.  (Tr. 83).  On

10

cross-examination, Tuttle testified that Zabawa also told him that he would be arrested if he did not sign the consent form.  (Tr. 86).  According to Tuttle, the account name and passwords on the form are not in his handwriting.  (Tr. 82).

Tuttle further testified that when Zabawa telephoned him before the meeting, he asked Zabawa whether it would be "a good idea" to get an attorney.  (Tr. 92).  According to Tuttle, Zabawa replied that he did not need an attorney and could wait until the initial court appearance to obtain one.  (*Id.*).  Tuttle admitted that he sent numerous text messages to Zabawa prior to the February 19 meeting.  (Tr. 93).

Prior to the hearing, Tuttle submitted an affidavit to the Court in support of his suppression motions.  (Docket # 17-1).  He swore that the agents did not advise him of his *Miranda* warnings "in such a way that I understood [them]" and he did not knowingly and voluntarily agree to waive his rights and speak to the agents.  (*Id.* at ¶ 7).  He also swore that the agents subsequently contacted him and asked for his account information and password and that "[b]ased upon their statements to [him], [he] did not believe [he] had the right to refuse to provide such information."  (*Id.* at ¶ 8).  His affidavit does not state that Zabawa threatened him with jail if he did not sign the consent form.  (Docket # 17-1; *see* Tr. 89).

## DISCUSSION

I.  **Motion to Suppress Statements**

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's

statements that are the product of custodial interrogation unless it demonstrates that the

defendant was first warned of his Fifth Amendment privilege against self-incrimination and then

voluntarily waived that right.  *Miranda v. Arizona*, 384 U.S. at 444.  Accordingly, "[e]ven absent

the accused's invocation of [his rights], the accused's statement during a custodial interrogation

is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and

voluntarily waived [*Miranda*] rights when making the statement."  *United States v. Plugh*, 648

F.3d 118, 127 (2d Cir. 2011) (alteration in original) (quoting *Berghuis v. Thompkins*, 560 U.S.

370, 382 (2010)), *cert. denied*, 132 S. Ct. 1610 (2012).  To establish a valid waiver, the

government must prove by a preponderance of the evidence that (1) the waiver was "knowing" –

namely, that it was "made with a full awareness of both the nature of the right being abandoned

and the consequences of the decision to abandon it," and (2) it was "voluntary" – namely, "that it

was the product of a free and deliberate choice rather than intimidation, coercion or deception."

*Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

In addition to establishing a valid waiver, the government must also establish that

the defendant's statements were not made involuntarily within the meaning of the Due Process

Clause.  *See Dickerson v. United States*, 530 U.S. 428, 433 (2000) (recognizing that there are

"two constitutional bases for the requirement that a confession be voluntary to be admitted into

evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of

the Fourteenth Amendment").  In examining whether a statement was made voluntarily, a court

must consider the totality of the circumstances in which it was given "to determine whether the

government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring

about [statements] not freely self-determined.'"  *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.)

(quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993).   In evaluating the totality of the circumstances, the court must assess:  "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials."  *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 131 S. Ct. 969 (2011).  Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed involuntary.  *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 954 (2011)), *cert. denied*, 133 S. Ct. 48 (2012).

On the record before me, I find that Tuttle was properly advised of his *Miranda* rights and voluntarily waived them before speaking to the agents.[4]  Specifically, Zabawa testified that he read aloud to Tuttle each of the *Miranda* warnings from a rights form and asked Tuttle to confirm that he understood each right.  Then, at Zabawa's direction, Tuttle read each right and placed his initials at the end of each statement to indicate that he understood his rights.  After Tuttle had completed reading and initialing the form, Zabawa asked Tuttle whether he understood his rights and would agree to waive his rights and speak to the agents; Zabawa informed him that he did not have to execute the form.  Tuttle responded that he understood and that he agreed to speak to the agents.  At that point, Tuttle executed the waiver portion of the

---

[4]  The government does not contest for purposes of this motion that Tuttle was in custody.  (Docket # 27 at 12 n.2).

form, which stated that Tuttle understood his rights and that his waiver was not the product of threats, promises or coercion.

Although the circumstances of the officers' entry into the apartment that day may have been intimidating, those circumstances, without more, do not render Tuttle's waiver or statements involuntary. *See United States v. Laidlaw*, 2010 WL 382551, *6 (D. Conn. 2010) ("[a]lthough being arrested by officers who have their weapons drawn is intimidating, 'the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness'") (quoting *United States v. Snype*, 441 F.3d 119, 131 (2d Cir.), *cert. denied*, 549 U.S. 923 (2006)). After the entry, the agents moved Tuttle off the floor to alleviate his discomfort, relocated to the kitchen, seated him at the table and removed his handcuffs. The interview was conducted by two agents and lasted approximately two hours. During the interview, Tuttle did not complain about pain or discomfort, appeared sober and coherent, did not request an attorney or ask to terminate the interview. On this record, I conclude that Tuttle's waiver of his *Miranda* rights and his subsequent statements were voluntary. *See United States v. Phillips*, 2009 WL 1918931, *2-3 (N.D. W. Va. 2009) (statement and consent were voluntary where "any guns which were drawn had been holstered well prior to the interview, the accused had been moved to a police car with only three officers present, and the surprise of the arrest had somewhat dissipated").

The fact that Zabawa advised Tuttle that the investigating agents had documents reflecting Tuttle's involvement in money transfers or that it would be in Tuttle's interest to cooperate does not undermine my conclusion that Tuttle's waiver and subsequent statements were voluntary. *See United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ("statements to

14

the effect that it would be to a suspect's benefit to cooperate are not improperly coercive"), *cert. denied*, 516 U.S. 1182 (1996); *United States v. Bye*, 919 F.2d 6, 9-10 (2d Cir. 1990) ("we are unconvinced that the mere mention of the possible sentence facing a defendant and the benefits to be derived from cooperation converts an otherwise proper encounter between the police and the accused into a coercive and overbearing experience").

Finally, I conclude that Zabawa's statement concerning the possibility that the agents would contact Child Protective Services did not render Tuttle's waiver or subsequent statements involuntary.  In general, "[l]aw enforcement threats to relatives – especially children – are particularly coercive."  *United States v. Venkataram*, 2007 WL 102102, *16 (S.D.N.Y. 2007); *see also United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) ("[t]he relationship between parent and child embodies a primordial and fundamental value of our society[;] [w]hen law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert . . . 'improper influence'") (internal quotations omitted).  Indeed, "[s]pecial care should be taken to ascertain the voluntariness of a confession when the confession is induced by threats against a third person because threats . . . [against] third persons can carry more leverage."  *United States v. Myers*, 2009 WL 579389, *7 (N.D. Ga. 2009).

Under certain circumstances, "[e]xpress threats that a defendant's children will be taken away if she fails to cooperate together with other coercive circumstances have been held to be so intimidating that the defendant's statements were rendered involuntary."  *United States v. Lawrence*, 2008 WL 5632268, *5 (D.V.I. 2008) (citing *Lynumn v. Ill.*, 372 U.S. 528 (1963) and *United States v. Tingle*, 658 F.2d at 1332).  However, an agent's statement concerning the

predicament facing a defendant will not necessarily render a subsequent confession involuntary, even when the statement concerns the welfare of the defendant's children. *See United States v. Mitchell*, 514 F. App'x 319, 322 (4th Cir. 2013) ("[t]ruthful statements about [the [d]efendant's] predicament are not the type of coercion that threatens to render a statement involuntary") (quoting *United States v. Braxton*, 112 F.3d 777, 780, 782 (4th Cir.), *cert. denied*, 522 U.S. 874 (1997)); *McCalvin v. Yukins*, 444 F.3d 713, 721 (6th Cir.) ("[w]e are not prepared to forbid police from conveying to suspects the seriousness of the crime for which they are being investigated"), *cert. denied*, 549 U.S. 1002 (2006); *United States v. Barro*, 2013 WL 3992405, *8 (E.D.N.Y. 2013) ("[agent's] statement of the fact that he would have to call Child Protective Services for [defendant's] child if both [defendant] and his wife were arrested is . . . not coercive"); *United States v. Velazquez-Corchado*, 2013 WL 1124678, *5 (D.P.R.) ("there is a difference in degree between the threat . . . that the State would cart the suspect's children away – and the perhaps menacing, but frankly accurate assessment presented to [defendant]: if convicted and jailed, she will probably not be near her daughter"), *report and recommendation adopted*, 2013 WL 1124508 (D.P.R. 2013).

    Having reviewed the totality of the circumstances, I conclude that Zabawa's statement that Child Protective Services would be contacted if narcotics were found in the residence did not render Tuttle's waiver and subsequent statements involuntary.  Zabawa testified that he only mentioned contacting Child Protective Services on one occasion.  In addition, and most importantly, Zabawa indicated that the search would be conducted regardless of whether Tuttle cooperated and that Child Protective Services could be called if narcotics were found.  In other words, the decision whether to contact Child Protective Services was apparently

conditioned on the presence of narcotics in the residence and not upon Tuttle's willingness (or unwillingness) to cooperate.

Nor does the record contain any other evidence to suggest that Tuttle's will was overborne. There is no evidence that the statements concerning Child Protective Services caused Tuttle to become emotionally distraught. During the subsequent interview, Tuttle did not request an attorney or that the questioning cease. In addition, Tuttle did not appear to be under the influence of alcohol or any other intoxicating substances. Prior to commencing the interview, Tuttle's handcuffs were removed, and Tuttle was permitted to smoke a cigarette during the course of the interview.

The circumstances surrounding Tuttle's waiver and subsequent statements are far different from the circumstances in which courts have found statements involuntarily induced by threats relating to a suspect's children. *See, e.g.*, *Lynumn v. Ill.*, 372 U.S. at 534 (pre-*Miranda* case in which statements were not voluntary where defendant with no prior criminal experience was surrounded by three police officers and told that her state assistance would be terminated and her children taken from her if she did not cooperate); *United States v. Ivy*, 165 F.3d 397, 402-04 (6th Cir. 1998) (consent not voluntarily given where officers threatened to arrest defendant's girlfriend and to place defendant's child into protective custody if defendant refused to give consent and where officers handcuffed defendant's girlfriend's legs to the kitchen table and repeatedly took the child from her); *Tingle*, 658 F.2d at 1336 (statements were involuntary where defendant, who was visibly shaking and who cried for ten minutes, was advised that she faced a lengthy sentence, would likely not see her child for an extended period of time, her cooperation would be reported to the prosecutor and that if she failed to cooperate the prosecutor would be

17

informed that she was "stubborn or hard-headed"); *United States v. Guzman*, 2013 WL 8475621, *2 (W.D. Tx. 2013) (statements involuntary where made "only after [the officer] made threatening statements about his power to have Child Protective Services take custody of [defendant's] child" and where defendant was separated from her child); *United States v. Perez-Guerrero*, 2012 WL 683201, *12 (D. Kan. 2012) (statements involuntary where defendant, who was only eighteen and had limited education, "was repeatedly told over the course of the evening that she needed to cooperate or she could lose custody of her child" and where the officer "made clear that cooperation was the only thing that would prevent her baby from being placed in state custody").

In this case, by contrast, Zabawa's statement concerning Child Protective Services was not conditioned on Tuttle's decision whether to cooperate.  Instead, Zabawa's reference to Child Protective Services reflected the factual circumstances facing Tuttle and his family if narcotics were discovered in the premises.  *See, e.g.*, *United States v. Mitchell*, 514 F. App'x at 322 (statement voluntary even if officer threatened that Department of Social Services would take custody of girlfriend's child; "[t]ruthful statements about [the [d]efendant's] predicament are not the type of coercion that threatens to render a statement involuntary[;] . . . given the presence of drugs, firearms, and evidence of drug manufacturing in the home, [the defendant's girlfriend] could have lost custody of her children"); *McCalvin v. Yukins*, 444 F.3d at 715-16, 721 (statements voluntary where officer told defendant that if she was convicted of first degree murder "she would spend the rest of her life in prison and would not have contact with her family, including her children[;] . . . [w]e are not prepared to forbid the police from conveying to suspects the seriousness of the crime for which they are being investigated"); *United States v.*

*Alvarado*, 882 F.2d 645, 649-50 (2d Cir. 1989) (statements voluntary despite agent's statement

that defendant had a daughter and that it would be in her best interest to cooperate; "the

circumstances presented here . . . do[] not establish any reiterated recital of maximum penalties,

threats to denounce [defendant] to the prosecutor, repetitive references to separation from her

daughter, or accusations of lying"), *cert. denied*, 493 U.S. 1071 (1990), *overruled on other*

*grounds*, *Bailey v. United States*, 516 U.S. 137 (1995); *United States v. Barro*, 2013 WL

3992405 at *2, 8 (statements voluntary despite agent's statement that "[defendant] and his wife

were both under arrest and that the agents were going to have to call Child Protective Services

for his child[;] . . . [agent's] statement of the fact that he would have to call Child Protective

Services for [defendant's] child if both [defendant] and his wife were arrested is . . . not

coercive"); *United States v. Garcia*, 2011 WL 6010296, *5 (E.D.N.Y. 2011) ("[t]he mere fact

that [the agent] told [d]efendant, if both he and his wife were incarcerated, then his children

would have to be turned over to a responsible adult or Administration for Children's Services,

does not constitute coercion"); *United States v. Brown*, 2011 WL 1428260, *3 (D.S.C. 2011)

("even if the officers stated that everyone was going to jail and that the child would be placed

into [Department of Social Services] custody, such statements would qualify as truthful

statements about the [d]efendant's predicament and would not be the type of coercion to render

[d]efendant's subsequent statements involuntary"); *United States v. Lawrence*, 2008 WL

5632268 at *7 ("the ICE agents' statement about [d]efendant's possible jail time and separation

from her children were not misrepresentations and such statements cannot be deemed to be so

coercive as to have overborne [d]efendant's will"); *United States v. Venkataram*, 2007 WL

102102 at *18 ("[s]howing [defendant] surveillance photographs of her children, while telling

her to consider her children when deciding whether to cooperate, may have had a very strong

emotional impact on [defendant's] decision to . . . make statements; however, considering the

totality of the circumstances, it is insufficient to render [defendant's] confession not voluntary");

*United States v. Henderson*, 2010 WL 1565295, *4 (M.D. Pa. 2010) (consent not involuntary

where inspector told defendant's wife that if she were arrested, Child Protective Services could

be called; inspector "accurately informed [defendant's wife] of the current situation, and the

possible outcome if she did not cooperate"), *aff'd*, 437 F. App'x 96 (4th Cir.), *cert. denied*, 132

S. Ct. 786 (2011); *United States v. Prince*, 157 F. Supp. 2d 316, 327-28 (D. Del. 2001)

("[defendant] was merely advised that her children should be her first concern[;] [t]here is no

evidence in the record which would suggest that [defendant] was told that her cooperation would

have a significant impact on her right to see her children").

On the record before me, I conclude that Tuttle's waiver was knowing and

voluntary and that his subsequent statements were voluntary and free from undue coercion.

Accordingly, I recommend that the district court deny Tuttle's motion to suppress statements.


## II.   <u>Motion to Suppress Evidence</u>

I now turn to Tuttle's motion to suppress any evidence seized when the agents

assumed his online presence.  (Docket # 26 at 11).  Because the evidence was obtained without a

warrant, its legality turns on whether Tuttle voluntarily consented to the agents' assumption of

his online presence.  *See Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*) (citing

*California v. Carney*, 471 U.S. 386, 390-91 (1985)).

A consent need only be voluntary, that is, obtained without coercion, even if it was given without knowledge of the right to refuse consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). Voluntariness is determined based upon the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. at 227; *United States v. Hernandez*, 5 F.3d 628, 632 (2d Cir. 1993); *United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990). Among the relevant considerations are: age, education, background, physical and mental condition, the setting in which the consent is obtained, whether *Miranda* warnings are administered and whether the individual has knowledge of the right to refuse consent. *See Schneckloth*, 412 U.S. at 226; *United States v. Kon Yu-Leung*, 910 F.2d at 41. "Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority," *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (citations omitted), *cert. denied*, 511 U.S. 1130 (1994), and the fact that it is obtained while the individual is in custody does not render it involuntary, *see, e.g., United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988), although it does "require more careful scrutiny," *United States v. Wiener*, 534 F.2d 15, 17 (2d Cir.), *cert. denied*, 429 U.S. 820 (1976). The government bears the burden of establishing by a preponderance of the evidence that the consent was voluntary. *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004); *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied*, 454 U.S. 830 (1981).

Considering the totality of the circumstances, I find that Tuttle's consent to allow the agents to assume his online presence was voluntary. In doing so, I find credible the testimony of Zabawa, which establishes that neither he nor Kosich threatened Tuttle with arrest in order to

induce him to provide account information and sign the consent.  Having heard their testimony, I find that O'Dell's and Tuttle's contrary testimony is not credible.

On this record, I find that Tuttle first consented verbally to the agents' adoption of his online identity to further the investigation during a telephone call preceding the February 19 meeting.  Zabawa's testimony establishes that during the call Tuttle was informed that he did not have to cooperate, but that his cooperation would be reported to the USAO.  Tuttle agreed to the agents' use of his online identity, remarking, "anything [I] [can] do to cooperate."  (Tr. 24-25). During the February 19 meeting, which Tuttle attended voluntarily, he reaffirmed his decision to cooperate with the agents.  During the meeting, Zabawa read the consent form to Tuttle and inquired whether Tuttle understood the form.  In response, Tuttle provided his passwords and account information and confirmed that he understood the form.  Tuttle signed the form below a printed statement acknowledging that his consent was freely and voluntarily given.  He appeared coherent and not intoxicated at the time.  Neither before nor during the approximate twenty-minute meeting did Tuttle indicate that he wished to consult an attorney.  Under such circumstances, I find that Tuttle's consent was voluntary, and I recommend that the district court deny Tuttle's motion to suppress any evidence obtained as a result of the agents' assumption of Tuttle's online presence.

## <u>CONCLUSION</u>

For the reasons stated above, I recommend that the district court deny Tuttle's

motions to suppress statements and tangible evidence.  (Docket ## 17, 26).

**IT IS SO ORDERED.**


                                        _s/Marian W. Payson_____
                                        MARIAN W. PAYSON
                                        United States Magistrate Judge

Dated:  Rochester, New York
          June ___3___, 2014

23

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[5]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See, e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

  *s/Marian W. Payson*
  MARIAN W. PAYSON
  United States Magistrate Judge

Dated: Rochester, New York
  June __3__, 2014

---

[5]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).