UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                                    Plaintiff,

                                                                                   Case #13-CR-6109-FPG

v.

                                                                                   DECISION & ORDER

RONALD TUTTLE,

                                                   Defendant.
_____

By text order dated July 30, 2013, this case was referred to United States Magistrate Judge Marian W. Payson, pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B). Dkt. #11. The four count Indictment in this case alleges that Defendant Ronald Tuttle committed various crimes related to the importation and distribution of 3,4-methylenedioxypyrovalerone (MDPV). Specifically, Count One charges Tuttle with conspiring to possess with intent to distribute and distributing MDPV in violation of 21 U.S.C. § 846; Count Two charges Tuttle with conspiring to import MDPV into the United States from China in violation of 21 U.S.C. § 963; Count Three charges Tuttle with importing MDPV into the United States from China on January 7, 2013 in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and 960(b)(3); and Count Four charges Tuttle with attempting to possess with intent to distribute MDPV on February 7, 2013 in violation of 21 U.S.C. § 846. The indictment also alleges an aiding and abetting theory for Counts Three and Four, in violation of 18 U.S.C. § 2. Dkt. #10.

Defendant's motions seek to suppress (1) statements that he made to law enforcement on February 7, 2013 at his residence in Elmira, New York and (2) evidence relating to e-mail communications and other evidence obtained by law enforcement agents who assumed Tuttle's on-line presence on or about February 19, 2013. Dkt. #17. Magistrate Judge Payson conducted

a suppression hearing on December 20, 2013, where the government's sole witness was Special Agent Francis Zabawa ("Zabawa") of the Department of Homeland Security. The Defendant also testified at the hearing, as did the Defendant's fiancee, Chrystal O'Dell ("O'Dell"). Dkt. #22. After receiving further submissions from the parties (Dkt. ##26, 27), Magistrate Judge Payson issued her Report and Recommendation on June 3, 2014, which recommends the denial of Defendant's suppression motions. Dkt. #30. On June 17, 2014, Defendant timely objected to Magistrate Judge Payson's Report and Recommendation. Dkt. #31.

Since Defendant has filed objections, this Court must conduct a *de novo* review as to those portions of the Report and Recommendation to which objections have been made. *See* 28 U.S.C. § 636(b)(1)(C). In doing so, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* As part of this review, the Court has considered all of the parties' submissions to date, as well as the transcript of the suppression hearing. Based upon that *de novo* review, I find no basis to alter, modify or reject Magistrate Judge Payson's Report and Recommendation.

Regarding Defendant's motion to suppress statements that he made to law enforcement at his residence on February 7, 2013, I note at the outset a significant discrepancy between what Defendant stated when he originally brought the suppression motion, and the argument now advanced by Defendant. The basis for suppression, as stated by Defendant's counsel in his moving papers, is that Defendant "was not advised of his constitutional rights before being subjected to questioning." Dkt. #17, ¶ 9. Defendant's affidavit in support of that application similarly states that "[t]he agents did not first advise me of my Miranda warnings in such a way that I understood my constitutional rights." Dkt. #17-1, ¶ 7.

In his post-hearing submission, Defendant has apparently abandoned the argument that law enforcement failed to inform him of his *Miranda* rights, and instead argues a separate basis

2

for suppression not previously presented. Defendant now argues that his *Miranda* waiver was involuntary because Defendant's "decision to waive his constitutional rights was based upon the agents' comments that if he refused to cooperate he could be arrested and Child Protective Services might be called." Dkt. #26. Similarly, in Defendant's objections to Magistrate Judge Payson's Report and Recommendation, Defendant argues this new theory, stating that law enforcement's "threat to call Child Protective Services must be considered a coercive tactic that rendered Tuttle's waiver of his constitutional rights involuntary." Dkt. #31.

I would also note that Defendant's objections to Magistrate Judge Payson's Report and Recommendation argue that "the consistent testimony of Tuttle and O'Dell clearly demonstrates that Tuttle's waiver was not the product of a free and deliberate choice," (Dkt. #31, p.8). While it is true that Defendant and O'Dell testified at the suppression hearing, neither one provided any testimony regarding the events of February 7, 2013. Rather, both Defendant's and O'Dell's testimony was confined to events surrounding a separate meeting that took place on February 19, 2013 and the resulting assumption of Defendant's e-mail account and on-line presence by law enforcement that will be discussed later.

Nevertheless, it is well settled that the government bears the burden of establishing a defendant's knowing and voluntary waiver of his *Miranda* rights in order for the statements to be admissible. *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citation omitted). Further, "Voluntariness is to be determined by viewing the totality of the circumstances and assessing whether the conduct of law enforcement officials was such as to overbear the defendant's will to resist and bring about confessions not freely self-determined." *United States v. Alvarado*, 882 F.2d 645, 649 (2d Cir. 1989) *overruled on other grounds, Bailey v. United States*, 516 U.S. 137 (1995).

Magistrate Judge Payson's thorough Report and Recommendation recounts the interactions of February 7, 2013, but to briefly summarize, law enforcement conducted a controlled delivery of purported narcotics at the Defendant's residence that day. Shortly after the Defendant accepted the package, law enforcement executed a search warrant at the residence. Defendant, who was inside the residence, was handcuffed and taken into the kitchen, where Special Agent Zabawa and Special Agent Kosich of the Department of Homeland Security were located. The agents removed Defendant's handcuffs, and told Defendant that they "had some questions that [they] would like for him to answer, but in order to do that [they] would need him to acknowledge that he would waive his rights and agree to answer our questions." Tr. 11[1]. Defendant did not respond, and Zabawa told Defendant, "if he didn't want to answer questions, it was perfectly fine, it was no big deal, he didn't have to. But that we were going to continue with the search warrant and if we came across any illegal narcotics in the premises, that, you know, advised him that we possibly could have to call Child Protective Services because of the small baby that was in the residence." *Id.*

Within a few minutes, Defendant was read his *Miranda* rights using a standard form issued by the Department of Homeland Security. Tr. 15. Zabawa read the rights verbatim to Defendant, and then asked Defendant if he understood. When Defendant replied that he understood, he asked Defendant to read the statement of rights form himself, and initial after each statement to indicate that he understood. Defendant then read, and initialed, the form. Agent Zabawa then asked Defendant if he understood everything he just read, Defendant replied, "Yes, I understand, I will answer your questions," and signed the form at the bottom. Tr. 17. At no time did Zabawa seek to terminate the conversation[2], nor did he ever ask to speak with a

---

[1] References to the suppression hearing transcript (Dkt. #22) are denoted as "Tr. __".
[2] Defendant argues – without citing any cases – that because Defendant did not initially respond when Zabawa asked him to waive his rights, that his conduct "effectively invoke[ed] his right to

4

…

lawyer. There were no promises made or force used to obtain Defendant's consent, and Defendant appeared to be engaged during the conversation.

Indeed, since Defendant has abandoned his original argument that he was not read his *Miranda* rights, there appears to be no dispute over this fact, nor over the fact that Defendant agreed to waive those rights. There is also no dispute that Defendant was in custody at the time he made the statements at issue. Rather, Defendant's objections are based upon one issue: whether that waiver was coerced by Zabawa's reference to potentially having to contact child protective services if narcotics were found in the home. Having reviewed the record and the relevant case law, I conclude, as did Magistrate Judge Payson, that there was nothing improper about Agent Zabawa's conduct.

To be sure, courts have found statements to be involuntary where the agents conduct exerted undue pressure upon a defendant. For example, in *Lynumn v. Illinois*, 372 U.S. 528, 533-34 (1963) the Supreme Court found a confession to be involuntary where law enforcement told the defendant that she was facing 10 years in jail if she didn't talk to them, that her financial aid for her children would be cut off if she didn't answer questions, and that if she didn't cooperate, her children would be taken away from her and she would never see them again.

The single statement from Zabawa in this case is a far cry from the conduct disapproved in *Lynumn*. Rather, I agree with Magistrate Judge Payson that Zabawa's single reference to child protective services was a fair statement of the circumstances Defendant faced if narcotics were found in the residence, and that the statement was not conditioned on Defendant's choice to speak with the agents or not. Indeed, courts facing similar – and perhaps more threatening – situations have also found statements made during those encounters to be admissible. *See, e.g.*,

---

remain silent." Dkt. #31, p.12. The Supreme Court rejected a similar argument in *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) where it reaffirmed that "an accused who wants to invoke his or her right to remain silent to do so unambiguously."

*United States v. Barro*, No. 12-CR-160 (NGG)(LB), 2013 WL 3992405, at *2, 8 (E.D.N.Y. Aug. 2, 2013) (statements voluntary despite agent's statement that "[defendant] and his wife were both under arrest and that the agents were going to have to call Child Protective Services for his child[;] ... [agent's] statement of the fact that he would have to call Child Protective Services for [defendant's] child if both [defendant] and his wife were arrested is ... not coercive"); *United States v. Garcia*, No. 09-CR-330 (DLI), 2011 WL 6010296, at *5 (E.D.N.Y. Nov. 30, 2011) ("[t]he mere fact that [the agent] told [d]efendant, if both he and his wife were incarcerated, then his children would have to be turned over to a responsible adult or Administration for Children's Services, does not constitute coercion"); *United States v. Mitchell*, 514 F. App'x 319, 322 (4th Cir. 2013) (statement voluntary even if officer threatened that Department of Social Services would take custody of girlfriend's child; "[t]ruthful statements about [the [d]efendant's] predicament are not the type of coercion that threatens to render a statement involuntary[;] ... given the presence of drugs, firearms, and evidence of drug manufacturing in the home, [the defendant's girlfriend] could have lost custody of her children").

Finally, as Magistrate Judge Payson pointed out, there is simply no evidence to suggest that Defendant's will was overborne by the single factual reference to child protective services. There is no testimony that Tuttle became emotionally distraught, nor did he ask to speak to any attorney, or in any way seek to terminate the interview. Rather, Tuttle made an informed and voluntary decision to waive his rights and speak with the agents, and as a result, suppression is not warranted.

The remaining issue relates to whether Defendant consented to law enforcement assuming the Defendant's online presence through the use of his e-mail account. The government bears the burden of establishing by a preponderance of the evidence that consent was freely and voluntarily given. *United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004).

6

"Voluntariness is a question of fact determined by a 'totality of all the circumstances.'" *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

At the suppression hearing, Agent Zabawa, Defendant, and O'Dell testified regarding the consent form that was executed on February 19, 2013, and testified to two very different versions of that day's events.

Agent Zabawa testified that a few days prior to February 19, 2013, he called Defendant and asked Defendant if he would be willing to let him "assume his online identity so we can further investigate the supplier of MDPV in China." Tr. 24. Defendant agreed, and the parties agreed to meet in a shopping plaza parking lot a few days later, on February 19, 2013. During that meeting, in which Zabawa, Kosich, Defendant and O'Dell were present, Zabawa again told Defendant that law enforcement wanted to assume his online presence. Zabawa asked Defendant if he would be willing to provide his account name and passwords, and Defendant verbally provided that information. Zabawa wrote down the passwords and account information on the consent form. Zabawa read the entire consent form to Defendant, and asked him if he understood what he was allowing law enforcement to do. Specifically, Zabawa asked "do you understand that, you know, you're allowing us to, you know, go through your e-mails and to send an e-mail and assume your online presence?" and Defendant replied, "Yes, I understand that's what you guys are going to do." Tr. 57. Zabawa then said, "if you understand that, please – and you acknowledge it, sign the form, print it and put the date and time." *Id.* Defendant then signed and printed his name, the date, and the time on the form. Zabawa testified that there were no threats or promises made to Defendant to obtain his consent. Zabawa finally told Defendant he would call him if they had any questions, and the meeting ended.

On the other hand, Defendant's fiancee, Chrystal O'Dell, testified that she was with Defendant on February 19, 2013 when they met with law enforcement. O'Dell testified that

7

when they arrived at the parking lot, law enforcement asked Defendant for his password and screen name. She further testified that Defendant was told that if he didn't provide the password, that "there was going to be bigger problems" and that Defendant could be arrested right then and there. Tr. 68. She testified that Zabawa then gave Defendant the consent form and "asked Ron Tuttle to fill it out," and Defendant signed the form. Tr. 69. O'Dell further testified that neither Defendant nor Zabawa read the consent form, and that it was Defendant himself who wrote his e-mail address and password on the consent form. Tr. 72-3. O'Dell was then shown the consent form, and she testified that she recognized Defendant's handwriting, and that the account name and password on the consent form were indeed in Defendant's handwriting. Tr. 74-5.

Finally, Defendant also testified about the events of and leading up to February 19, 2013. Defendant testified that he received a phone call from Zabawa a few days before February 19, 2013, where Zabawa told him he wanted to take over his e-mail account. Defendant said that Zabawa told him that he "can get somebody down there to bring you back up here and put you under arrest if you don't turn over this e-mail to me." Tr. 78. During the February 19, 2013 meeting, Defendant testified that he asked Zabawa what would happen if he didn't turn over his e-mail account, to which Zabawa replied "I could put you in the car right now and arrest you." Tr. 80. Defendant then said that Zabawa had him fill out the consent form, and sign it. He testified that he did not read the form, and that he felt like he would go to jail unless he complied. Tr. 81. When asked who wrote the password and account name on the form, Defendant could not recall who filled it out. *Id.* When Defendant was then shown the consent form, he confirmed that the document contained his signature, that Defendant printed his own name, the date and the time. Tr. 81-2. Defendant further said that the account name and password did not look like his handwriting, and that he provided that information to Zabawa who "wrote as I spelled it. There

we go. That's exactly who wrote that account name part. He wrote it out as I spelled it to him." Tr. 82-3.

There does not appear to be any real dispute that the conduct testified to by Agent Zabawa would establish the Defendant's knowing and voluntary consent. Rather, Defendant argues that the events did not transpire in the way Agent Zabawa testified that they occurred, and under the version of events testified to by Defendant and O'Dell, any consent that was obtained was coerced and therefore involuntary.

Defendant therefore objects to Magistrate Judge Payson's credibility determination, in which she determined Agent Zabawa's testimony to be credible, and found the testimony of Defendant and O'Dell to be less than credible.

While Defendant may disagree with Magistrate Judge Payson's credibility determination, "the Second Circuit has instructed that where a Magistrate Judge conducts an evidentiary hearing and makes credibility findings on disputed issues of fact, the district court will ordinarily accept those credibility findings." *United States v. Lawson*, 961 F. Supp. 2d 496 (W.D.N.Y. 2013) (Arcara, J.) (citing *Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008) and *Grassia v. Scully*, 892 F.2d 16, 19 (2d Cir. 1989)).

After reviewing the record, I find no basis to disturb Magistrate Judge Payson's credibility determinations, and based on that determination and the totality of the circumstances, this Court concludes, as did Magistrate Judge Payson, that the government has met its burden of establishing that Defendant voluntarily consented to having law enforcement access his e-mail account and assume his online identity. Therefore, there is no basis for suppression.

Based on all of the foregoing, the Court accepts and adopts the Report and Recommendation filed by United States Magistrate Judge Marian W. Payson (Dkt. #30) in its

entirety, and Defendant's motions to suppress statements and evidence (Dkt. ##17, 26) are denied in all respects.

IT IS SO ORDERED.

Dated: Rochester, New York
      July 24, 2014

_____
HON. FRANK P. GERACI, JR.
United States District Judge